IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-34

No. 438A19

Filed 16 April 2021

IN THE MATTER OF: G.B., M.B., and A.O.J.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 7 August 2019 by Judge Monica M. Bousman in District Court, Wake County. This matter was heard in the Supreme Court on 13 January 2021.

*Mary Boyce Wells, Office of the Wake County Attorney, for petitioner-appellee Wake County Human Services.*

*Michelle FormyDuval Lynch and Reginald O'Rourke for appellee guardian ad litem.*

*Robert W. Ewing for respondent-appellant mother.*

*Sean Paul Vitrano for respondent-appellant father.*

MORGAN, Justice.

Respondent-mother and respondent-father appeal from the trial court's order terminating their parental rights to their minor children M.B. (Mark), who was born in November 2013, and G.B. (Gail), who was born in July 2016. Respondent-mother also appeals from the portion of the same order which terminated her parental rights to her minor daughter from a previous relationship, A.O.J. (Ann), who was born in December 2005.[1] Ann's father is not a party to this appeal. After careful review, we

---

[1] Pseudonyms are used to protect the identities of the juveniles and for ease of reading.

conclude that the trial court properly adjudicated at least one ground for termination and did not abuse its discretion in determining that termination of respondents' parental rights was in the children's best interests. Accordingly, we affirm the termination of parental rights order.

## I.  Factual Background and Procedural History

In November 2016, all three children were living with respondents. On 30 November 2016, respondent-father became incarcerated and remained in this capacity throughout the proceedings in this case. After respondent-father's incarceration, respondent-mother became involved in a romantic relationship with Deyonte Galloway, a nineteen-year-old with several felony convictions on his record.

In April 2017, officers with the Fuquay-Varina Police Department found Mark, who was three years old at the time, wandering outside alone and only wearing a diaper. After investigating this circumstance by going door-to-door in the neighborhood, the officers located respondent-mother's home. When questioned, respondent-mother responded that no one in the home had realized that Mark was outdoors. Between April and June 2017, Mark experienced several injuries, including three black eyes and bruising that appeared to have been made by fingers. On 5 June 2017, Mark suffered a broken arm, but respondent-mother did not seek care for her son until two days later. After Mark received a cast for the broken limb on 7 June 2017, respondent-mother left Mark in the bathtub, causing the cast to get wet and

requiring a new cast to be created for Mark's arm on the following day.

At some point, petitioner Wake County Human Services (WCHS) received reports that respondent-mother and Galloway had substance abuse issues and that they engaged in domestic violence in the presence of the children, including incidents that left holes in the walls of respondent-mother's home and other occasions during which Galloway damaged respondent-mother and Ann's cellular telephones to prevent them from contacting help. In August 2017, respondent-mother tested positive for cocaine and marijuana; in another instance, respondent-mother refused to provide a hair sample for a drug screen after having admitted that she had previously used urine obtained from Ann in order to favorably affect her drug screen results. WCHS also received reports that respondent-mother (1) had thrown a shoe at Mark, striking his head; (2) had been moving the children from hotel to hotel along with Galloway—a known gang member with multiple outstanding arrest warrants—in order to avoid Galloway's arrest; (3) was verbally abused by Galloway when she made telephone calls; and (4) failed to use a voucher that she received to obtain free eyeglasses for Ann, who is legally blind as a result of a degenerative eye disease.

On 13 October 2017, WCHS filed a petition alleging that Gail, Mark, and Ann were abused and neglected juveniles. A nonsecure custody order was entered by the trial court on the same date. On 20 October 2017, an amended petition was filed which added allegations regarding (1) a sexual assault committed against Ann by

Galloway's brother and (2) respondent-mother's use of Ann to provide urine samples for respondent-mother's drug screen. Pursuant to the trial court's nonsecure custody order, Mark and Gail were placed with their paternal grandparents and Ann was placed in foster care. At an adjudication hearing held on 14 November 2017, respondents entered into a consent order in which they admitted that all three children were neglected juveniles and that Mark was an abused juvenile in that "the child's parent, guardian, custodian or caretaker has inflicted or allowed to be inflicted on the child a serious physical injury by other than accidental means and has created or allowed to be created a substantial risk of physical injury by other than accidental means."

¶ 6         Respondent-mother agreed to a case plan under which she would (1) have supervised visitation with the children for one hour per week, (2) obtain and maintain safe, stable housing for herself and her children, (3) not allow Galloway in the vicinity of her children, (4) obtain and maintain legal and sufficient income for herself and her children, (5) provide documentation to verify her income once a month, (6) complete a psychological evaluation and comply with any resulting recommendations, (7) complete a substance abuse assessment and comply with any resulting recommendations, (8) submit to random drug screens upon the request of WCHS and treatment providers, (9) complete a parenting education program and demonstrate skills and lessons learned, (10) complete a domestic violence assessment and any

program or services which were recommended, and (11) successfully complete a non-offending caregiver program and demonstrate lessons learned. Under his own case plan, respondent-father agreed to (1) establish legal paternity of Mark, (2) complete a substance abuse assessment and comply with all resulting recommendations, (3) submit to random drug screens upon the request of WCHS and treatment providers, (4) complete a mental health assessment and comply with all resulting recommendations, (5) obtain and maintain safe, stable housing, and (6) maintain lawful income sufficient to meet the needs of his family and provide monthly verification of it to WCHS.

¶ 7    At a review hearing in February 2018, respondent-mother represented that she was living with an aunt in Holly Springs and that she was no longer in a relationship with Galloway. However, family members reported that respondent-mother had simply left her belongings with the aunt and was not actually staying in the aunt's home. In addition, respondent-father, who had been scheduled for release from incarceration in March 2018, had been charged with illegally possessing a cellular telephone while incarcerated, had received an additional 11-23 months of active time, and had subsequently lost his right to visitation with Mark and Gail. Furthermore, the children's maternal grandmother, with whom Mark and Gail had been living, had reported to WCHS that the grandmother needed medical treatment due to her cancer diagnosis and could not provide further care for the children at the

time. Consequently, Mark and Gail were placed with foster parents. All three children were reported to be doing well in their respective foster placements.

¶ 8    At a subsequent permanency planning review hearing in August 2018, the trial court found that respondent-mother was unemployed and living with her mother. Respondent-mother had also been charged with possession of marijuana, possession of drug paraphernalia, and carrying a concealed weapon after being discovered engaging in sexual activity in a car with Galloway in June 2018. When a WCHS social worker interviewed respondent-mother about the incident, respondent-mother was untruthful, stating that she had been pulled over in a friend's car while alone in the vehicle. Respondent-father had been transferred to Mountain View Correctional Institution (MVCI) in June 2018 upon having received six infraction reports while incarcerated at his previous penal facility, Franklin Correctional Center. Respondent-father was transferred again in August 2018, going to Avery-Mitchell Correctional Institution. While at this facility, he received numerous infractions for disobeying orders, obtaining tattoos, assaulting and threatening staff, and making false accusations.

¶ 9    At a February 2019 permanency planning review hearing, the trial court found that respondent-mother continued to test positive for the presence of impairing substances and continued to be involved with Galloway, who attended at least one visitation with the children in violation of the visitation agreement. The case's

guardian ad litem (GAL) recommended that the primary plan become adoption because the children could not return to the care of respondents within a reasonable time, noting that since the previous permanency planning hearing, respondent-father had received twelve infractions while incarcerated and had advised the social worker that he was going "to continue to receive infractions." The trial court changed the children's primary plan to adoption.

¶ 10      On 22 March 2019, WCHS filed a motion to terminate the parental rights of both respondents, alleging the existence of the following grounds: (1) neglect, (2) that respondents "willfully left the juvenile[s] in foster care for more than twelve months without showing to the satisfaction of the court that reasonable progress had been made in correcting the conditions that led to the removal of the" children, and (3) that the children had been in the custody of WCHS during which respondents, for a period of six months preceding the filing of the motion, willfully failed for such period "to pay a reasonable portion of the cost of the care for the [children] although physically and financially able to do so." *See* N.C.G.S. § 7B-1111(1), (2), and (3) (2019). A hearing on the motion to terminate the parental rights of both respondents was held in June 2019, by which time the children had been in the custody of WCHS for more than eighteen months. After the hearing, the trial court found the existence of all three alleged grounds to terminate the parental rights of each respondent. The trial court went on to conclude that termination of both respondents' parental rights was in the

best interests of the children. Both respondents appeal from the order terminating their respective parental rights.

## II.    Standards of Review

¶ 11    When considering a petition to terminate parental rights, the trial court must first adjudicate the existence of the grounds for termination which have been alleged. *See* N.C.G.S. § 7B-1109 (2019). "At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes." *In re A.U.D.*, 373 N.C. 3, 5–6 (2019) (quoting N.C.G.S. § 7B-1109(f)). This Court reviews a trial court's adjudication of the existence of grounds to terminate parental rights in order "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re E.H.P.*, 372 N.C. 388, 392 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111 (1984)). All findings of fact which are not challenged by a respondent are binding on appeal. *In re T.N.H.*, 372 N.C. 403, 407 (2019) (citing *Koufman v. Koufman*, 330 N.C. 93, 97 (1991)). "The trial court's conclusions of law are reviewable de novo on appeal." *In re C.B.C.*, 373 N.C. 16, 19 (2019).

¶ 12    If the trial court finds that at least one ground to terminate parental rights under N.C.G.S. § 7B-1111(a) exists, "it then proceeds to the dispositional stage," *In re A.U.D.*, 373 N.C. at 6, at which it "determine[s] whether terminating the parent's

rights is in the juvenile's best interest." N.C.G.S. § 7B-1110(a) (2019). In making that

determination, the trial

> court shall consider the following criteria and make written
> findings regarding the following that are relevant:
> (1) The age of the juvenile.
> (2) The likelihood of adoption of the juvenile.
> (3) Whether the termination of parental rights will
> aid in the accomplishment of the permanent plan for
> the juvenile.
> (4) The bond between the juvenile and the parent.
> (5) The quality of the relationship between the
> juvenile and the proposed adoptive parent,
> guardian, custodian, or other permanent placement.
> (6) Any relevant consideration.

*Id.* § 7B-1110(a). In reviewing a trial court's dispositional determination, we evaluate

the trial court's conclusion that a termination of parental rights would be in the best

interests of the child under an abuse of discretion standard. *In re E.H.P.*, 372 N.C.

388, 392 (2019). "Abuse of discretion results when the court's ruling is manifestly

unsupported by reason or is so arbitrary that it could not have been the result of a

reasoned decision." *In re Z.L.W.*, 372 N.C. 432, 435 (2019).

### III.    Respondent-father's Appeal

Respondent-father contends that the trial court erred both in finding the

existence of at least one ground for the termination of his parental rights to Mark and

Gail and in determining that the termination of his parental rights would be in the

children's best interests. We disagree with both contentions.

**A. Adjudication**

¶ 14 Respondent-father first challenges the trial court's conclusion that the ground existed to terminate his parental rights to Mark and Gail based upon his willful failure to make reasonable progress in correcting the circumstances that led to their removal from respondent-mother's home. *See* N.C.G.S. § 7B-1111(a)(2) ("The parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile."). We conclude that the trial court did not err in finding the existence of this ground for the termination of respondent-father's parental rights.

¶ 15 Respondent-father argues that the trial court erroneously considered the circumstance of his incarceration in two ways: by finding that his incarceration was a factor that caused his children to be placed in foster care and by failing to take into account the limitations that incarceration imposed upon respondent-father's ability to comply with his case plan. Respondent-father notes that he was incarcerated at the time that the children were taken into WCHS custody and asserts that the conditions which led to the children being taken into the custody of WCHS were substance abuse, domestic violence, and failure to address medical needs—conditions created or caused by respondent-mother and Galloway, and thus unrelated to respondent-father's incarceration. Respondent-father further contends that "the

court was obligated to consider the limitations the incarceration imposed on his ability to comply with the case plan, as well as other relevant factors."

We do not subscribe to respondent-father's view of these considerations. To the contrary, our review of the case reveals that the trial court carefully considered evidence about respondent-father's ability to achieve his case plan requirements despite his incarceration, as well as the impact of respondent-father's acts and decisions while incarcerated, in making its findings of fact and ultimately in determining that respondent-father had failed to make reasonable progress.

While "[a] parent's incarceration is a circumstance that the trial court must consider in determining whether the parent has made reasonable progress toward correcting those conditions which led to removal of the juvenile," *In re C.W.*, 182 N.C. App. 214, 226 (2007) (quotation marks omitted), "incarceration, standing alone, neither precludes nor requires finding the respondent willfully left a child in foster care." *In re Harris*, 87 N.C. App. 179, 184 (1987). Here, the trial court observed that respondent-father was incarcerated when the children were removed from respondent-mother's home and recognized it as an occurrence which resulted in the children's placement in foster care. However, the trial court did not rely upon the fact of respondent-father's incarceration, standing *alone,* to conclude that the children needed to be placed in foster care or that respondent-father had failed to make reasonable progress. Concomitantly, the trial court did not ignore the impact of

respondent-father's incarceration in assessing his ability to follow his case plan and to make reasonable progress through compliance with it.

¶ 18    In our view, the trial court properly considered evidence regarding respondent-father's initial incarceration at the time that the children were removed from the home and properly evaluated areas in which respondent-father made some progress on his case plan—such as his attenuated attendance at Narcotics Anonymous meetings and his attainment of several negative drug screens—along with respondent-father's unfortunate choices and actions while incarcerated which were demonstrably detrimental to respondent-father's ability to complete his case plan. Such choices and actions resulted in a lengthy delay in respondent-father's projected release date from incarceration and significantly limited his access to classes, programs, services, and employment which directly related to his case plan. For example, the trial court specifically found that:

- respondent-father, at the time of the filing of the petition, "was housed in a local facility" and had a projected release date within three to four months;

- respondent-father had the opportunity to work in a job at the sign plant which would have allowed him to earn money to aid in the care of his children and which would have earned him "gain time" to push forward his release date, but despite the ability to do the job, respondent-father chose to forego the opportunity because he did not want the job;

- respondent-father "received nineteen infractions during his incarceration" and "was placed in restricted confinement six times" as a result;

- respondent-father, having been relocated to a different correctional facility due in some measure to his infractions of penal rules, was unable to enroll

in desired classes, which would have reduced the period of incarceration which he was required to serve;

- respondent-father, at the time of the termination hearing, was held in solitary confinement by his own request following the stabbing of respondent-father by gang members;

- respondent-father had tattoos identifying him as a gang member although he denied being actively involved in a gang;

- respondent-father's "lengthy incarceration limited his ability to participate in the services necessary to put him in a position to reunify with his children";

- respondent-father illegally obtained a cellular telephone while incarcerated which resulted in an additional sentence, extending his potential release date; and

- respondent-father's "repeated criminal activity and other decision making" in prison "resulted in his absence from his children's lives for at least sixteen months longer than anticipated at the time of adjudication."

¶ 19     The dissent prefers to cast a view which diminishes the harmful impact upon the children of the last two cited findings of fact which the trial court made regarding the elongation of respondent-father's time of incarceration due to the parent's voluntary choices. The dissent endeavors to buttress this stance by isolating respondent-father's cellular telephone offense to the exclusion of respondent-father's other deleterious decisions, while incorrectly elevating the role of this conviction among the plentiful considerations which resulted in the termination of respondent-father's parental rights. However, "the best interests of the juvenile are of paramount consideration by the court and . . . when it is not in the juvenile's best interest to be

returned home, *the juvenile will be placed in a safe, permanent home within a reasonable amount of time.*" N.C.G.S. § 7B-100(5) (emphasis added); *see also In re N.G.*, 374 N.C. 891, 907 (2020).

¶ 20        In his appeal to this Court, respondent-father has acknowledged the negative effect of his relocation from Franklin Correctional Center—a facility where he was able to receive drug screens, participate in Narcotics Anonymous, and have access to an approved parenting program in pursuit of the satisfactory completion of his case plan—to MVCI, the facility to which he was transferred upon his aggregation of infractions and where the above-referenced opportunities were either unavailable or more difficult to obtain. Also, respondent-father did not complete a mental health assessment, which was another element of his case plan, in part because once he was transferred to MVCI respondent-father was "mostly in isolation" and often could not receive visits, even from a mental health professional. Further, the trial court disapproved of visits between respondent-father and the children at MVCI because of the distance that the children would have to travel.

¶ 21        We agree with respondent-father that his ability to comply with his case plan was hampered by his movement to certain penal institutions and the limited options offered by those institutions to fulfill his case plan, as opposed to those more plentiful resources which were available at the facilities to which he was previously assigned. There were also restrictions on programs made available to respondent-father due to

his specific incarceration status. However, the evidence in this case shows that respondent-father chose to engage in activities during his incarceration which created these obstacles for him and also decided to reject beneficial opportunities which were made available to him. Respondent-father himself constructed the very barriers to the achievement of his case plan goals about which he now complains. Accordingly, we determine that there is no error in the trial court's findings of fact regarding respondent-father's failures in accomplishing his case plan, most of which resulted from circumstances for which respondent-father was responsible.

¶ 22      In sum, respondent-father repeatedly elected to engage in behaviors which significantly extended his incarceration, greatly limited his options, and frequently eliminated his opportunities, thus rendering him unavailable as a potential placement for Mark and Gail and also eradicating his prospect of visits with the children. These findings of fact which are supported by the evidence in turn support the ultimate determination by the trial court that respondent-father failed to make reasonable progress on his case plan. As such, we affirm the trial court's conclusion that the ground existed to terminate respondent-father's parental rights for failure to make reasonable progress under the circumstances in correcting the conditions that led to removal pursuant to N.C.G.S. § 7B-1111(a)(2). Because the existence of only one ground as identified by N.C.G.S. § 7B-1111 is required to support termination of parental rights, we do not address respondent-father's arguments as

to the remaining two additional grounds for termination of his parental rights which were found by the trial court.

**B. Disposition**

¶ 23      Respondent-father argues that the trial court abused its discretion in determining that termination of respondent-father's parental rights was in the best interests of the juveniles Mark and Gail. Specifically, respondent-father asserts that "in light of [his] imminent completion of his sentence, the skills he had acquired in prison, his ability and desire to support the children, and his interest in remaining their father, termination was contrary to their best interests." This assertion is unpersuasive.

¶ 24      The dissenting view takes sweeping liberties to construct its conclusion that this Court affirms the trial court's order which terminates the parental rights of respondent-father merely because he is incarcerated. In creating this narrative, the dissent has devised propositions that are conclusory, deduced theories that are illusory, and ultimately developed positions that are contradictory. Although the opposing opinion characterizes our decision as being premised solely upon respondent-father's incarceration, a deeper analysis demonstrates that respondent-father's voluntary failure to fulfill the requirements of his case plan and his repeated unwillingness to engage in identified available opportunities consistent with his case plan are the overarching components in his failure to make reasonable progress

under the circumstances in correcting the conditions that led to removal of the children from the home.

¶ 25     Due to being riveted by respondent-father's incarceration, and combined with this Court's determination that the ground of failure to make reasonable progress was sufficiently proven to exist at the trial level, so as to lead to termination of respondent-father's parental rights, the dissent unfortunately conflates its perceived view that termination of respondent-father's parental rights occurred *because* he was incarcerated with our actual view that respondent-father failed to make reasonable progress and the trial court concluded that it was in the children's best interests to terminate respondent-father's parental rights *because* he consistently engaged in activities on a voluntary basis while incarcerated which inhibited his ability to satisfy his case plan and consequently experienced negative consequences for his negative behavior which further compromised his opportunities to fulfill his case plan. Although respondent-father happened to be incarcerated as these circumstances were transpiring, his lack of freedom did not uniquely distinguish him from parents with court-ordered case plans who are not incarcerated who likewise consistently engage in activities on a voluntary basis which inhibit their abilities to satisfy their respective case plans, consequently experience negative consequences for their negative behavior, and ultimately have their parental rights terminated as a result.

¶ 26     "Incarceration, standing alone, is neither a sword nor a shield in a termination

of parental rights decision." *In re M.A.W.*, 370 N.C. 149, 153 (2017) (quoting *In re P.L.P.*, 173 N.C. App. 1, 10 (2005), *aff'd per curiam*, 360 N.C. 360 (2006)) (citation omitted); *see also In re T.N.H.*, 372 N.C. at 412; *see also In re S.D.*, 374 N.C. 67, 75 (2020). While the dissent attempts to cast our decision to affirm the trial court's order terminating respondent-father's parental rights as an outcome which utilizes respondent-father's incarceration as a sword against him, it is ironic that the dissent in the present case trumpets the employment of respondent-father's incarceration alone as a shield to protect him from the adverse consequences of his failure to satisfactorily complete his case plan.

¶ 27      As noted previously, a trial court's decision to terminate parental rights is reviewed only for abuse of discretion. Respondent-father does not take issue with the analysis employed here by the trial court but only accentuates that he was scheduled to be released shortly after the end of the termination of parental rights hearing, that he had plans for housing and employment upon his release, and that he had a strong desire to maintain his relationship with his children. While we acknowledge respondent-father's desire to retain his parental rights, he has not demonstrated that the trial court's disposition was "manifestly unsupported by reason or . . . so arbitrary that it could not have been the result of a reasoned decision." *In re Z.L.W.*, 372 N.C. at 435. Therefore, we affirm the trial court's order terminating respondent-father's parental rights.

## IV.     Respondent-mother's Appeal

¶ 28          Respondent-mother challenges only the trial court's dispositional determination that termination of her parental rights was in the children's best interests. Specifically, she notes that "this Court stated in a . . . recent opinion that the abuse of discretion standard of review applies on appeal when determining if termination of parental rights is in the best interests of the child," citing *In re D.L.W.*, 368 N.C. 835, 842 (2016). However, respondent-mother contends that "this Court [should] apply a de novo standard of review for the legal conclusion that termination of parental rights is in a child's best interest since a trial court is required to make certain written findings of fact to support its conclusion of law." We disagree with this assertion.

¶ 29          Respondent-mother cites our decision in *Carolina Power & Light Co. v. City of Asheville*, 358 N.C. 512, 517 (2004) for the proposition that "[c]onclusions of law drawn by the trial court from its findings of fact are reviewable de novo on appeal." She then asserts that because N.C.G.S. § 7B-1110 was amended in 2011 to require trial courts at the disposition stage to consider the criteria enumerated in N.C.G.S. § 7B-1110(a), which we previously referenced, and to make written findings regarding those criteria that are relevant in any case, an appellate court should conduct de novo review of a trial court's best interests determination instead of utilizing an abuse of discretion standard. However, respondent-mother cites no

authority to support her argument and further fails to address any of the numerous cases decided by this Court in which we have applied an abuse of discretion standard at the disposition stage of a termination of parental rights case. *See, e.g.*, *In re D.L.W.*, 368 N.C. at 842; *In re L.M.T.*, 367 N.C. 165, 171 (2013). Decades ago, this Court in *In re Montgomery* designated the trial court's determination at the disposition stage of a termination of parental rights hearing as discretionary. 311 N.C. 101, 108 (1984) ("[W]here there is a reasonable hope that the family unit within a reasonable period of time can reunite and provide for the emotional and physical welfare of the child, the trial court is given *discretion* not to terminate rights." (emphasis added)). At no point during this interim time period, including the 2011 amendment raised by respondent-mother, has the Legislature chosen to amend the pertinent statute to alter our holding in *In re Montgomery* by explicitly establishing a de novo standard of review at the disposition stage of a termination of parental rights proceeding. *See Raeford Lumber Co. v. Rockfish Trading Co.*, 163 N.C. 314, 317 (1913) (holding that we presume that the Legislature acts with full knowledge of prior and existing law and its construction by the courts.).

¶ 30        More recently, in *In re C.V.D.C.*, 374 N.C. 525 (2020), we considered and rejected the exact argument advanced here by respondent-mother "regarding the appropriate standard of appellate review for a disposition entered under N.C.G.S. § 7B-1110(a)." *Id.* at 528–29 (discussing but declining to accept a respondent-parent's

assertion that de novo review is appropriate at the disposition stage based upon the respondent-parent's contention that "our deferential posture [is] a vestige of such decisions as *In re Montgomery*, . . . which predate the amendments to N.C.G.S. § 7B-1110(a) enacted by the legislature in 2005 and 2011 to safeguard the rights of parents"). *See also In re Z.L.W.*, 372 N.C. at 435 ("The trial court's assessment of a juvenile's best interest at the dispositional stage is reviewed only for abuse of discretion."). As in that case, "we again reaffirm our application of the abuse of discretion standard when reviewing the trial court's determination of 'whether terminating the parent's rights is in the juvenile's best interest' under N.C.G.S. § 7B-1110(a)." *In re C.V.D.C.*, 374 N.C. at 529; *see also In re K.S.D-F.*, 375 N.C. 626, 636 (2020) (citing *In re C.V.D.C.* for the proposition that an "argument that each of the N.C.G.S. § 7B-1110(a) factors weighs against termination in this matter when reviewed under a de novo standard cannot prevail").

¶ 31        In the present case, where the trial court made specific findings regarding the relevant criteria identified in section 7B-1110 and where respondent-mother has not argued that the dispositional determination of the trial court is not "manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision," *In re Z.L.W.*, 372 N.C. at 435, we hold that the trial court did not abuse its discretion under N.C.G.S. § 7B-1110(a). We therefore affirm the order of the trial court terminating respondent-mother's parental rights.

AFFIRMED.

Justice EARLS dissenting.

Respondent-father was incarcerated and his two children were in the custody of their mother when the events occurred which led to the children being adjudicated abused and neglected and taken into care in October 2017. He was still incarcerated when the trial court held hearings on 5, 6 and 27 June 2019 on the petition for termination of parental rights, although the trial court made a finding that he was due to be released "in late July 2019." Publicly available records indicate respondent was indeed released from custody on 26 July 2019 and he was therefore no longer in prison by the time the trial court entered its order terminating his parental rights on 7 August 2019. The trial court's findings of fact as they relate to respondent-father do not support the conclusion that he failed to make reasonable progress in correcting the conditions that led to the children being taken into care and his parental rights should not be terminated on that basis. Instead, the majority makes its own findings. North Carolina is not a jurisdiction which provides for the termination of parental rights merely because a parent is incarcerated. The trial court's order should be reversed as to respondent-father.

States vary widely in how incarceration of a parent impacts the determination of whether a parent's rights to a child should be terminated. *See* Steven Fleischer, *Termination of Parental Rights: An Additional Sentence for Incarcerated Parents*, 29 Seton Hall L. Rev. 312, 325 (1998) (categorizing state statutes). *See also* Stuart M. Jones, *Not Perfect, but Better than Most: South Carolina's TPR Process and Its*

*Surprisingly Fair Treatment of Incarcerated Parents,* 62 S.C. L. Rev. 697, 700 (2011) ("By 2005, TPR statutes in thirty-six states listed a parent's incarceration as an element to be considered in a TPR proceeding. Twenty-five of these states use the length of the parent's prison sentence as a determining factor in whether incarceration is grounds for a TPR action. Some of these states specify exactly how long a parent must be imprisoned, while others speak in broader terms.").

Some states allow incarceration as a ground for the termination of parental rights. *See, e.g.,* Alaska Stat. § 47.10.080 (o)(1) (2020) (incarceration may be a sufficient ground for termination if the term of incarceration is "significant" in light of the child's age and need for adult supervision); Colo. Rev. Stat. § 19-3-604(b)(III) (2020) (permitting termination of parental rights if the parent will be incarcerated for more than six years from the date the child was adjudicated dependent or neglected); Ky. Rev. Stat. Ann. §§600.020(2)(b), 610.127(1) (2021) (reasonable efforts to reunify a child do not need to be made when parent will be incarcerated for more than a year beyond the date the child is taken into care); N.D. Cent. Code § 27-20-02 (2021) (reasonable efforts to reunify a family not necessary if a parent is incarcerated for a specific length of time measured by the child's age). Other states only allow incarceration for certain offenses to be a ground for termination of parental rights. *See, e.g.,* Ind. Code §§ 31-35-3, -4 (2021) (a conviction for certain crimes, including murder, involuntary manslaughter, or rape, can be grounds for termination of

parental rights).

On the other end of the spectrum are states with statutes that specifically say that incarceration alone is not a basis for termination of parental rights. *See, e.g.*, Mass. Gen. Laws ch. 210, § 3(c)(xiii) (2021) ("Incarceration in and of itself shall not be grounds for termination of parental rights;"); Mo. Laws § 211.447(7)(6) (2020) (same); Neb. Rev. Stat. § 43-292.02(2)(b) (2021) (state shall not file petition for termination of parental rights if the sole basis for the petition is that the parent or parents are incarcerated). Other states have specifically created statutory exceptions to the general time limits on how long reasonable efforts must be made to reunify a family when a parent is incarcerated. *See, e.g.,* Colo. Rev. Stat. § 19-3-604(2)(k)(IV) (2020); N.M. Stat. Ann. § 32A-4-29(G)(9) (2021).

What matters for this case is that the North Carolina General Assembly has not provided for incarceration as a ground for termination of parental rights. Therefore it is inappropriate for this Court to create such a basis. Yet that is precisely what the majority opinion effectively accomplishes through the back door of basing termination here on respondent-father's decisions "to engage in behaviors which significantly extended his incarceration, greatly limited his options, and frequently eliminated his opportunities, thus rendering him unavailable as a potential placement for Mark and Gail and also eradicating his prospect of visits with the children." These statements are equally true of every parent who is incarcerated, and

cannot, under North Carolina law, support a determination that the incarcerated parent should lose their parental rights.

¶ 37    This legal error is compounded by the majority's willingness to find its own facts where the trial court's order is deficient. Our task when reviewing a trial court's order terminating the rights of a parent to their child is "to determine whether the findings are supported by clear, cogent, and convincing evidence and the findings support the conclusions of law." *In re K.H.*, 375 N.C. 610, 612 (2020) (quoting *In re Z.A.M.*, 374 N.C. 88, 94 (2020)). The majority's opinion goes beyond this task and supplements the trial court's order with new factual findings. The trial court's findings do not support its ultimate conclusion that respondent-father willfully failed to make reasonable progress to correct the conditions leading to his children's removal from their home. As a result, this is not a legally permissible ground for termination of respondent's parental rights in this case.

¶ 38    Respondent-father was incarcerated on 30 November 2016. Almost a year later, while he was serving his sentence, Mark and Gail were removed from the home of respondent-mother and her boyfriend because, as the trial court found, "the children were exposed to domestic violence" perpetrated by the boyfriend against respondent-mother, respondent-mother's boyfriend had intentionally injured Mark, Mark's medical needs "were not being met in a timely manner," respondent-mother and her boyfriend "were engaged in substance abuse," and respondent-father was in

prison. Plainly, the only circumstance identified by the trial court that pertained to respondent-father—rather than to respondent-mother and her abusive boyfriend—and resulted in the children's removal from the home was that respondent-father was incarcerated.

¶ 39    As the majority notes, respondent-father subsequently entered into a case plan with Wake County Human Services which required him to (1) establish legal paternity of Mark, (2) complete a substance abuse assessment and comply with recommendations, (3) submit to random urine and hair sample drug screens, (4) complete a mental health assessment and comply with any recommendations, (5) obtain and maintain safe, stable housing, and (6) obtain and maintain lawful income sufficient to meet the needs of his family and provide monthly verification of the same.

¶ 40    The trial court's findings do not establish that respondent-father failed to comply with this case plan. *See In re A.J.P.*, 375 N.C. 516, 525 (2020) ("[P]arental compliance with a judicially adopted case plan is relevant in determining whether grounds for termination exist pursuant to N.C.G.S. § 7B-1111(a)(2) . . . as long as the objectives sought to be achieved by the case plan" address the circumstances that resulted in the children's removal from the home.). Rather than finding that respondent-father did not comply with his case plan, the trial court's findings pertaining to respondent-father focus almost exclusively on the fact of his

incarceration. Of eleven factual findings, one (Finding of Fact #31) addresses the fact that respondent-father established paternity of Mark, two (Findings of Fact #36 and #37) address the fact that respondent-father quit his job while in prison, and the remaining eight have to do with respondent-father being incarcerated.

¶ 41    In Finding of Fact #32, the trial court states that respondent-father does not make decisions that are in the best interests of his children, which appears to be a conclusory finding premised upon the findings which follow it. In Findings of Fact #33 and #34, the trial court states that respondent-father has been incarcerated since 30 November 2016, before the incidents which led to the children's removal from the home, and that he was convicted of illegally possessing a cellphone, which extended his release date. In Finding of Fact #35, the trial court states that respondent-father wanted to participate in classes that would reduce the amount of time that he was incarcerated, but that he "was unable to enroll in classes at the facilities where he was housed." In Findings of Fact #36 and #37, the trial court states that respondent-father was able to work, but chose not to, and that respondent-father might have had an earlier release date if he chose to work. The trial court stated in Finding of Fact #38 that respondent-father had received infractions while incarcerated and that he has been placed in solitary confinement "which he reports is by his choice for his own protection, as gang members stabbed him in March 2019, when he refused to carry out an assault as directed by a higher-ranking gang member in the prison." In

Finding of Fact #39, the trial court found that respondent-father denied active involvement in a gang but acknowledged having gang tattoos. In Finding of Fact #40, the trial court found that respondent-father had a limited ability to participate in services as a result of his lengthy incarceration. Finally, in Finding of Fact #41, the trial court found that respondent-father's decisions resulted in incarceration, and a resulting absence from his children's lives "for at least sixteen months longer than anticipated at the time of adjudication."

¶ 42   The trial court's order is devoid of findings related to respondent-father's completion of a substance abuse assessment and compliance with any recommendations, respondent-father's submission to random drug screens, respondent-father's completion of a mental health assessment and compliance with any recommendations, whether respondent-father had safe and stable housing prepared for his pending release from incarceration, or whether respondent-father had similarly made plans for obtaining lawful income sufficient to meet the needs of his family. The only trial court finding relating directly to respondent-father's case plan states that respondent-father established paternity of Mark, which suggests compliance with his case plan. The only other aspect of the case plan which might arguably be addressed in the trial court's findings is the requirement that respondent-father obtain and maintain lawful income sufficient to meet the needs of his family—the trial court found that respondent-father "would have earned some

amount of money while working a job in prison," but does not find—and indeed, it is implausible to assume—that this would have been close to sufficient to meet the needs of respondent-father's children.

¶ 43 The trial court's findings also fail to establish that respondent-father failed to make "reasonable progress under the circumstances . . . in correcting those conditions which led to the removal of the juvenile[s]." N.C.G.S. § 7B-1111(a)(2) (2019). A parent need not "completely remediate the conditions that led to the children's removal" nor "render herself capable of being reunified with her children" to avoid termination of parental rights under N.C.G.S. § 7B-1111(a)(2). *In re J.S.*, 374 N.C. 811, 819–20 (2020). "Only reasonable progress in correcting the conditions must be shown." *Id.* at 819 (quoting *In re L.C.R.*, 226 N.C. App. 249, 252 (2013)). Further, a trial court "must consider" a parent's incarceration "in determining whether the parent has made 'reasonable progress' toward 'correcting those conditions which led to the removal of the juvenile.' " *In re A.J.P.*, 375 N.C. at 530 (quoting *In re C.W.*, 182 N.C. App. 214, 226 (2007)).

¶ 44 As noted previously, the children were removed from the home of respondent-mother and her boyfriend primarily because respondent-mother and her boyfriend exposed the children to domestic violence, substance abuse, and physical abuse and failed to address the children's medical needs. However, a parent in a termination of parental rights action cannot be held responsible for the actions of others. Natural

parents have a "fundamental liberty interest . . . in the care, custody, and management of their child" which "does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). In recognition of this interest, this Court has long held that only the parent's "conduct inconsistent with the parent's protected status" or a finding that the parent is unfit will warrant application of the best interests of the child standard to award custody to a nonparent over the parent. *Price v. Howard*, 346 N.C. 68, 79 (1997); *see also Owenby v. Young*, 357 N.C. 142, 145 (2003). ("Therefore, unless a natural parent's conduct has been inconsistent with his or her constitutionally protected status, application of the 'best interest of the child' standard in a custody dispute with a nonparent offends the Due Process Clause of the United States Constitution."). This standard of conduct is lower than that warranting termination of parental rights pursuant to statute. *Price*, 346 N.C. at 79. It follows, then, that if a determination that a parent has acted inconsistently with his or her constitutionally protected status as a parent must be based on the conduct of that parent, the higher standard of conduct warranting termination of parental rights cannot be based on the conduct of another, for which the parent would be less culpable. *C.f. In re D.W.P.*, 373 N.C. 327, 339–40 (2020) (affirming trial court's decision to terminate the parental rights of a mother where the facts showed that her boyfriend likely caused a child's injuries because the mother re-established a

relationship with the boyfriend, hid the relationship from social services, and refused "to make a realistic attempt to understand how [the child] was injured or to acknowledge how her relationships affect her children's wellbeing"). Instead, a parent's progress, or lack thereof, in ameliorating the conditions which led to a child's removal must relate to the conditions for which the parent is responsible.

¶ 45        Even assuming that respondent-father could be held responsible for ameliorating the conditions which were caused by respondent-mother and her boyfriend, the trial court's findings do not, at any point, reference respondent-father's progress or lack thereof in addressing these circumstances. For example, the trial court's findings do not address respondent-father's plans for his children after his incarceration was to end—whether he planned to shield them from abuse by respondent-mother and her boyfriend, whether he had made progress toward being capable of addressing their medical needs, or whether he himself was engaging in substance abuse or domestic violence. As a result, the trial court's findings do not at all address, with respect to respondent-father, what the trial court found to be the principal circumstances that led to the children's removal, even while the trial court's order terminates respondent-father's parental rights for failing to correct the conditions which led to the children's removal.

¶ 46        Taken together, the trial court's findings establish that respondent-father was incarcerated and, as a result, not present to care for his children, and that

respondent-father possessed a cellphone while incarcerated, which lengthened his incarceration. The trial court describes this as "repeated criminal activity and other decision making [which] resulted in [respondent-father's] absence from his children's lives for at least sixteen months longer than anticipated at the time of adjudication." While it may be true that respondent-father's conduct in prison resulted in a longer period of incarceration, I fail to see the justice, much less the legal basis, for terminating a father's rights in his children because he possessed a contraband cellphone while incarcerated. In any case, a parent's incarceration does not by itself support a trial court's decision to terminate the parent's rights to a child. *In re S.D.*, 374 N.C. 67, 75 (2020) ("Incarceration, standing alone, is neither a sword nor a shield in a termination of parental rights decision." (cleaned up)).

¶ 47    The majority, in an attempt to shore up the trial court's thin basis for termination, posits that the trial court neither relied upon respondent-father's incarceration nor ignored it in reaching the determination that respondent-father's rights were subject to termination. The majority reaches this conclusion, however, by supplementing the trial court's order with its own facts. For example, the majority writes that the trial court "properly evaluated areas in which respondent-father made some progress on his case plan," referencing attendance at Narcotics Anonymous meetings and attaining several negative drug screens. However, neither those facts nor any evidence of their consideration appears in the trial court's order. The majority

also states that respondent-father's "choices and actions . . . significantly limited his access to classes, programs, services, and employment which directly related to his case plan." Again, this does not appear in the trial court's order. Instead, the trial court found that respondent-father's "lengthy incarceration limited his ability to participate in the services necessary to put him in a position to reunify with his children." However, this conclusory statement does nothing to support a finding that respondent-father willfully failed to complete his case plan. Indeed, the trial court's order makes no reference to the substance abuse, mental health, housing, or income needs which were the subject of respondent-father's case plan. Moreover, while the majority seems to have found as a fact that respondent-father was "relocated to a different correctional facility" without classes that would have reduced respondent-father's period of incarceration "due in some measure to his infractions of penal rules," such a finding is not contained in the trial court's order. In fact, the trial court's order does not even suggest, as the majority does, that respondent-father was responsible for his inability to participate in classes, stating only that respondent-father "wanted to participate in classes" but was "unable to enroll in classes at the facilities where he was housed."

Regardless of the majority's assertions to the contrary, the trial court here did not weigh all of the evidence and come to a reasoned conclusion that, taking into account the barriers imposed by respondent-father's incarceration, respondent-father

nevertheless willfully failed to ameliorate the conditions which led to the children's removal from their home despite respondent-father's ability to do so. Rather, the trial court's findings clearly demonstrate that the trial court terminated respondent-father's parental rights because he was incarcerated and, while incarcerated, delayed his release by possessing a cellphone. The trial court made no reference to the substance abuse, domestic abuse, physical abuse, and lack of medical care that resulted in the children's removal, likely because those circumstances were not attributable to respondent-father. The trial court did not even make reference to respondent-father's case plan, except to note that he had entered into one.

The majority also relies upon "the best interests of the juvenile" in its defense of the trial court's determination that grounds existed to terminate respondent-father's parental rights, citing N.C.G.S. § 7B-100(5) (stating that one purpose of the "Abuse, Neglect, Dependency" subchapter of the Juvenile Code is to ensure "that the best interests of the juvenile are of paramount consideration by the court"). However, in termination of parental rights proceedings, the best interests of the juvenile are considered at the *dispositional* stage. N.C.G.S. § 7B-1110(a) (2019) ("After an adjudication that one or more grounds for terminating a parent's rights exist, the court shall determine whether terminating the parent's rights is in the juvenile's best interest."). At the adjudicatory stage, the only question for the trial court is whether grounds exist to terminate the respondent's parental rights. N.C.G.S. § 7B-1109(e)

(2019) ("The court shall take evidence, find the facts, and shall adjudicate the existence or nonexistence of any of the circumstances set forth in G.S. 7B-1111 which authorize the termination of parental rights of the respondent."). *See, e.g.*, *In re D.L.W.*, 368 N.C. 835, 842 (2016) ("The procedure for termination of parental rights involves a two-step process. In the initial adjudication stage, the trial court must determine whether grounds exist pursuant to N.C.G.S. § 7B-1111 to terminate parental rights. If it determines that one or more grounds listed in section 7B-1111 are present, the court proceeds to the dispositional stage, at which the court must consider whether it is in the best interests of the juvenile to terminate parental rights." (citations omitted)). *See also In re Mashburn*, 162 N.C. App. 386, 396 (2004) (stating that it is improper for a trial court to consider "best interests" testimony during adjudication). It is contrary to the statutory scheme to insert the best interests determination into the adjudication of whether grounds exist to terminate respondent's parental rights.

¶ 50    In some circumstances, this Court remands for further factual findings when the trial court's findings are lacking. *See, e.g.*, *In re C.L.H.*, 2021-NCSC-1, ¶ 20 (vacating and remanding for further proceedings where the trial court's findings did not establish the existence of a child support order enforceable during the relevant period); *In re R.D.*, 376 N.C. 244, 264 (2020) (vacating and remanding for entry of a new dispositional order where the disposition was premised on a factual

finding without record support); *In re N.K.*, 375 N.C. 805, 825 (2020) (remanding "for further proceedings" where the record did not indicate whether the trial court complied with the notice provisions of the Indian Child Welfare Act); *In re K.C.T.*, 375 N.C. 592, 602, (2020) (reversing and remanding for entry of a new order "containing proper findings and conclusions" where the trial court did not find willful intent on the part of a parent when terminating parental rights pursuant to N.C.G.S. § 7B-1111(a)(7)); *In re K.R.C.*, 374 N.C. 849, 865 (2020) (vacating and remanding for the entry of additional findings and conclusions where "the trial court erred in its failure to enter sufficient findings of ultimate fact and conclusions of law" to support its dismissal of a petition for termination of parental rights); *In re K.N.*, 373 N.C. 274, 284–85 (2020) (vacating and remanding for further proceedings, "including the entry of a new order containing appropriate findings of fact and conclusions of law on the issue of whether grounds exist to support the termination of respondent's parental rights" where the trial court's adjudicatory findings were insufficient but the record contained evidence that could have supported the trial court's conclusion that termination was appropriate); *In re N.D.A.*, 373 N.C. 71, 84 (2019) (same); *Coble v. Coble*, 300 N.C. 708, 714–15 (1980) (vacating and remanding for further evidentiary findings where findings did not establish that plaintiff was in need of financial assistance from the defendant but where evidence in the record could support such findings in an appeal from an order requiring defendant to provide partial child

support); *see also In re K.H.*, 375 N.C. 610, 618 n.5 (2020) (suggesting that the proper disposition is reversal rather than remand where the Court does "not find such evidence in the record . . . that could support findings of fact necessary to conclude that" a respondent's parental rights are subject to termination under grounds identified by the trial court). The significance of these cases here is the strong precedent they set contrary to the notion that this Court can fill in the gaps when a trial court's order fails to make the required factual findings to support termination of parental rights.

¶ 51        The United States Supreme Court has recognized that parenting is a fundamental right. *See Troxel v. Granville*, 530 U.S. 57, 66–67 (2000); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). For that reason, due process requires that a "clear and convincing evidence" standard of proof is required in order to "strike[ ] a fair balance between the rights of the natural parents and the State's legitimate concerns." *Santosky*, 455 U.S. at 769. Here, the trial court did not make adequate findings of fact based on that standard of proof, and this Court should not make its own findings. Respondent-father should not, in North Carolina, have his parental rights terminated merely because of his incarceration. The instant case is not one in which the trial court's findings justify severing the constitutionally protected bond between parent and child. I respectfully dissent from the majority's decision to affirm the trial court's order as to respondent-father.